Marc D. Fink (MN License # 343407)
4515 Robinson Street
Duluth, Minnesota 55804
Tel: 218-525-3884
Fax: 218-525-3857
marc@marcdfink.com

Peter Van Tuyn (AK Bar # 8911086)
Bessenyey & Van Tuyn
310 K Street, Suite 200
Anchorage, AK 99501
Tel:  907-278-2000
Fax:  907-278-2004
pvantuyn@earthlink.net

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS, and GLEN ITH, | ) ) ) ) | Case No: 3:06-CV-0068-JWS |
| Plaintiffs, | ) ) | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| vs. | ) ) | |
| UNITED STATES FOREST  SERVICE, an agency of the U.S. Department of Agriculture, | ) ) ) ) | |
| Defendant. | ) ) | |

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

I.      The Tongass National Forest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

II.     Logging Roads Associated with the Traitors Cove Timber Sale . . . . . . . . . . . .     4

III.    Logging Roads Associated with the Overlook Timber Sale . . . . . . . . . . . . . . .     5

IV.     Logging Roads Associated with the Logjam Timber Sale . . . . . . . . . . . . . . . .     7

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

I.      FSEEE Has Raised Serious Questions, and Will Prevail on the Merits . . . . . . .     10

        A.      The Forest Service Violated NEPA by Relying on a "Categorical
                Exclusion" for the Challenged Road Construction and
                Reconstruction Projects, Without Providing Public Notice, Scoping,
                or An Opportunity for Public Comment . . . . . . . . . . . . . . . . . . . . . . . . .     10

        B.      The Forest Service Violated NEPA by Not Analyzing and Disclosing
                the Environmental Impacts of the SW Neets, Rockfish, and Francis
                Cove Road Reconstruction, and the Traitors Cove Logging Project,
                within a Single EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

                1)      The Road Reconstruction and Logging Project are Connected
                        Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

                2)      The Road Reconstruction and Logging Project May Result in
                        Cumulatively Significant Impacts . . . . . . . . . . . . . . . . . . . . . . . .     17

        C.      The Forest Service Violated NEPA by Not Analyzing and Disclosing
                the Environmental Impacts of the Logjam Road Construction and
                Reconstruction Project, and Logjam Timber Sale, within a Single EIS . .     19

        D.      The Forest Service Violated NEPA by Proceeding with the Reopening
                and Reconstruction of the Logging Roads Prior to Completing the
                Environmental Analyses for the Associated Timber Sales . . . . . . . . .     19

E.    The Forest Service Violated the Appeals Reform Act by Authorizing and Proceeding with the Road Projects Prior to Providing Public Notice, Accepting Public Comments, and Allowing Administrative Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

II.    FSEEE Will Suffer Irreparable Harm if an Injunction is Not Issued, and the Balance of Harms Tips Strongly in FSEEE's Favor . . . . . . . . . . . . . . . . . . . . . .    24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

## TABLE OF AUTHORITIES

### CASES

*Alaska Center for the Environment v. U.S. Forest Service*
189 F.3d 851 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11, 12

*Am. Motorcyclist Ass'n v. Watt*
714 F.2d 962 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

Andrus v. Sierra Club,
442 U.S. 347 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

*Caribbean Marine Services v. Baldridge*,
844 F.2d 668 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

*Citizens for Better Forestry v. U.S. Dept. of Agriculture*,
341 F.3d 961 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25, 26

*Confederated Tribes and Bands of the Yakima Indian Nation v. FERC*,
746 F.2d 466 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

*Earth Island Institute v. Pengilly,*
376 F.Supp.2d 994 (E.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

*Edmonds Institute v. Babbitt,*
42 F. Supp. 2d 1 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

*Idaho Sporting Congress v. Alexander,*
222 F.3d 562 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

*Idaho Sporting Congress v. Thomas,*
137 F.3d 1146 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

*Jones v. Gordon,*
792 F.2d 821 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

*Metcalf v. Daley,*
214 F.3d 1135 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

*Natural Resources Defense Council v. United States Forest Service*
421 F.3d 797 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

*Neighbors of Cuddy Mountain v. U.S. Forest Service,*
137 F.3d 1372 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

*Northern Spotted Owl v. Hodel,*
716 F. Supp. 479 (W.D. Wash. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

*Portland Audubon Society v. Lujan,*
795 F. Supp. 1489 (D. Or. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

*Roe v. Anderson,*
134 F.3d 1400 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

*Save Our Ecosystems v. Clark,*
747 F.2d 1240 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

*Save the Yaak Committee v. Block*,
840 F.2d 714 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 20, 21, 22

*Thomas v. Peterson*,
753 F.2d 754 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 18, 26

*West v. Sec'y of Dep't of Transportation*,
206 F.3d 920 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

*Wilderness Society v. Rey*,
180 F.Supp.2d 1141 (D. Mont. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

*Wilderness Society v. Rey*,
Civ. 03-119-M-DWM (D. Montana) (April 24, 2006, Order) . . . . . . . . . . . . . . . . . . . . .     24

## STATUTES

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

5 U.S.C. § 706(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

16 U.S.C. § 1612 Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

16 U.S.C. § 1612(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23, 24

16 U.S.C. § 1612(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

16 U.S.C. § 1612(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

16 U.S.C. § 1612(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

42 U.S.C. § 4332(C)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

## REGULATIONS

40 C.F.R. § 1500.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10, 20

40 C.F.R. § 1500.1( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

40 C.F.R. § 1501.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

40 C.F.R. § 1501.4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

40 C.F.R. § 1502.2(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

40 C.F.R. § 1502.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

40 C.F.R. § 1502.14(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

40 C.F.R. § 1506.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

40 C.F.R. § 1506.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

40 C.F.R. § 1506.1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

40 C.F.R. § 1508.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10, 11

40 C.F.R. § 1508.25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

40 C.F.R. § 1508.25(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17, 19

40 C.F.R. § 1508.25(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 18, 19

40 C.F.R. § 1508.25(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

## MISCELLANEOUS

FSH 1909.15, Chapter 30.2(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

FSH 1909.15, Chapter 30.3(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

FSH 1909.15, Chapter 30.3(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

FSH 1909.15, Chapter 31.1b(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

FSH 1909.15, Chapter 31.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10, 11

70 Fed. Reg. 16,795 (April 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16, 17, 19, 23

70 Fed. Reg. 25,525 (May 13, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 19, 24

## INTRODUCTION

Plaintiffs Forest Service Employees for Environmental Ethics and Glen Ith (hereinafter "FSEEE") challenge the Forest Service's construction and reconstruction of the following logging roads on the Tongass National Forest: the SW Neets, Rockfish, and Francis Cove roads (associated with the Traitors Cove timber sale); Roads 6231 and 6232 (associated with the Overlook timber sale); and the Logjam roads (associated with the Logjam timber sale). The Forest Service violated the National Environmental Policy Act ("NEPA") and the Appeals Reform Act by soliciting bids, entering into contracts, and commencing with road reconstruction without providing an opportunity for public involvement, and prior to completing the required NEPA analyses, signing decision documents, and allowing appeals.

FSEEE has learned that the reconstruction of Roads 6231 and 6232, along with SW Neets, is already complete. *See* Declaration of Marc Fink, ¶ 3. The Rockfish road project is 79% complete, and road work has not yet commenced for Francis Cove. *Id*. Work on the Rockfish and Francis Cove roads is expected to begin this spring as soon as the weather permits, *id*., and FSEEE therefore seeks an immediate injunction to prohibit further work on these roads pending the resolution of this case.

FSEEE has also learned that the Forest Service is currently accepting bids concerning the construction and reconstruction of the "Logjam" roads, which are associated with the proposed Logjam timber sale. *See* Second Declaration of Andy Stahl, Exhibit G. Offers are being accepted through May 22, 2006, at which time FSEEE expects the Forest Service to sign the contract and authorize the road work to proceed. *Id*. FSEEE therefore seeks to enjoin the Forest Service from signing any contracts or otherwise authorizing any road construction or reconstruction related to the proposed Logjam timber sale.

FSEEE is likely to prevail on the merits, as the Forest Service failed to allow public scoping and provide documentation prior to relying on a categorical exclusion for the road construction and reconstruction projects, as required by the agency's own handbook and Ninth Circuit precedent.  The Forest Service also improperly segmented the SW Neets, Rockfish and Francis Cove road projects from the Traitors Cove environmental impact statement ("EIS"), in violation of NEPA, and similarly segmented the Logjam road project from the Logjam EIS.  The Forest Service further violated NEPA by soliciting bids, entering into contracts, and allowing major road work to proceed while the agency prepares the NEPA analyses for the associated timber sales.  In addition, the Forest Service violated the Appeals Reform Act by failing to notify the public, accept public comments, and allow administrative appeals prior to proceeding with the road construction and reconstruction projects.

The balance of harms tips in FSEEE's favor, as the construction, reopening, and continued reconstruction of these logging roads would adversely affect the environment and FSEEE's interests, while a temporary injunction would impose little hardship on the Forest Service.  A temporary restraining order and preliminary injunction should therefore be issued.

## BACKGROUND

### I.    The Tongass National Forest

"[T]he Tongass National Forest is an immense forest located in Southeast Alaska comprised of mainland and many islands within the Alexander Archipelago."  *Natural Resources Defense Council v. United States Forest Service*, 421 F.3d 797, 800 (9ᵗʰ Cir. 2005).  "The Tongass is the nation's largest national forest, and the largest unspoiled and intact temperate rainforest in the world, containing almost seventeen million acres and occupying about seven percent of Alaska's area." *Id*.  Unlike most national forests, the Tongass still contains "many undisturbed watersheds with a full complement of all native species including productive

populations of bald eagles, wolves, brown bears, and five species of anadromous salmon."
Declaration of Andy Stahl (hereinafter "Stahl Dec."), Ex. A at 1.[1]

The Tongass National Forest "includes a narrow mainland strip of steep, rugged
mountains and icefields, and more than 1,000 offshore islands." Stahl Dec., Ex. B at 2. The
"steep rugged terrain makes roads in this region vulnerable to erosion and landslides and very
expensive to construct." Stahl Dec., Ex. A at 2. About 5,000 miles of road has been constructed
on the Tongass, and new roads would further fragment this important ecosystem "and increase
risks, particularly to large carnivores and aquatic systems." *Id*., Ex. A at 1.

Roads on the Tongass National Forest are identified as classified, unclassified, or
temporary. Stahl Dec., Ex. B at 4. Classified roads are determined to be needed for various uses
and intended for long-term use. *Id*. Unclassified roads "are not needed for, and not managed as
part of, the forest transportation system." *Id*. Temporary roads are authorized by contract but
"not intended to be a part of the forest transportation system and not necessary for long-term
resource management." *Id*. Of the 5,000 miles of road, about 3,560 miles "are considered
classified or permanent roads." *Id.*, Ex. C at 3.

Roads are also defined according to the following "maintenance levels:"

Level 1 - Closed more than one year;
Level 2 - High-clearance vehicles;
Level 3 - Passenger vehicles, surface not smooth;
Level 4 - Passenger vehicles, surface smooth;
Level 5 - Passenger vehicles, dust free, possibly paved.

*Id*., Ex. B at 4-5. There are approximately 1,260 miles of "maintenance level 1" roads on the
Tongass National Forest, meaning they are "in storage and closed to normal passenger vehicle
use." *Id*., Ex. C at 3.

---

[1] The citations to the Exhibits attached to the Stahl Declaration are to the pdf page
number, and not to the page number of the actual document.

II.     **Logging Roads Associated with the Traitors Cove Timber Sale**

        In 2004, the Forest Service was preparing separate "environmental assessments" ("EAs")

for three logging projects on the Ketchikan Misty Fiords Ranger District of the Tongass National

Forest:  SW Neets, Rockfish, and Francis Cove.  *See* Stahl Dec., Ex. D at 1.  The Forest Service

proposed that the three projects would harvest a combined 18.5 million board feet of timber, and

would use the three "marine access facilities" (formally called "log transfer facilities") located at

Fire Cove, SW Neets, and Margaret Bay.  *Id*.  Upon review of the Project Update for the

projects, the National Marine Fishers Service ("NMFS") sent a letter to the Forest Service to

inform the agency that it must prepare an "Essential Fish Habitat" assessment for the proposed

projects pursuant to the Magnuson Stevens Fishery Conservation and Management Act.  Stahl

Dec., Ex. E.  NMFS stated that it was particularly concerned about Margaret Bay due to the

sensitive resources in the vicinity of the marine access facility.  *Id*.

        On April 1, 2005, the Forest Service changed course and decided to prepare the "Traitors

Cove" environmental impact statement ("EIS") to combine the SW Neets, Rockfish, and Francis

Cove logging projects into one proposal.  *See* 70 Fed. Reg. 16,795 (April 1, 2005) ("A

determination was made that there was a possibility of significant cumulative effects on these

project areas and therefore a decision was made to prepare and EIS.").  The proposed Traitors

Cove project would harvest about 16 million board feet of timber, and the logs would still be

barged from the marine access facilities located at Margaret Bay, SW Neets, and Fire Cove.  *Id*.

at 16,795-96.  The Forest Service is preparing the Draft EIS for the Traitors Cove proposal,

which is expected to be released for public comment in September, 2006.  Stahl Dec., Ex. F at 2.

        In the spring of 2005, the Forest Service solicited bids on three road reconstruction

projects:  SW Neets (8.44 miles), Rockfish (13.85 miles), and Francis Cove (3.79 miles).  *See*

Stahl Dec., Ex. N, O, P.  According to the Forest Service,  "[s]ome segments of all three of these

[road] systems could be used in the Traitor's Cove project to haul timber to the respective Log

Transfer Facility (LTF) to load on a barge that would be towed to a location for log processing."

*Id.*, Ex. G.  In fact, the three logging roads that are being reconstructed lead directly to the marine

access facilities that the Forest Service proposes to use for the Traitors Cove project, and each

road is adjacent to proposed harvest units.  *See* Stahl Dec., Ex. L at 2; Ex. M at 2; Ex. D at 3-5.

Even though the Draft EIS for the Traitors Cove project is still being prepared, however, all three

of these road contracts have already been awarded.  Furthermore, according to the Forest Service,

the reconstruction of SW Neets is already complete, the reconstruction of Rockfish is 79%

complete, and the reconstruction of Francis Cove is expected to start soon.  Declaration of Marc

Fink, ¶ 3.

The Forest Service claims that these road reconstruction projects are "covered under FSH

1909.15, chapter 31.12 and require no NEPA documentation."  *See* Stahl Dec., Ex. H.  The

Forest Service admits, however, that there was no scoping notice for the road reconstruction

projects.  *Id*.  The Forest Service did not notify the public that it was proposing a categorical

exclusion for these projects, did not request public comment, and did not allow administrative

appeals of the road work prior to implementation.

## III.    <u>Logging Roads Associated with the Overlook Timber Sale</u>

In April, 2005, the Forest Service completed an "environmental assessment" ("EA") for

the proposed Overlook logging project, which is located in the central portion of Mitkof Island

on the Petersburg Ranger District of the Tongass National Forest.  Stahl Dec., Ex. I.  The

Overlook EA discloses the potential environmental impacts of four alternatives.  Alternative 1 is

the "no action" alternative and proposes no timber harvest, road construction or road

reconstruction.  *Id*., Ex. I at 6.  Alternative 2 includes the reconstruction of about 1.2 miles of

Forest Service Road 6232 to access proposed harvest units.  *Id*., Ex. I at 6-7.  Alternative 3

includes the reconstruction of 0.8 miles of Forest Service Road 6231 to access proposed units. *Id.*, Ex. I at 7. And Alternative 4, which is identified as the "proposed action," includes the reconstruction of 2.2 miles of Forest Service Road 6232 to access proposed harvest units. *Id.*, Ex. I at 7-8.

According to the Overlook EA, Road 6231 is a "level 1" Forest Service road that was initially constructed as a temporary road in the early 1970s for timber harvest. *Id.*, Ex. I at 9. The level 1 status means that this road had been closed for more than one year, and the EA states that the road "is presently closed by alder growth." *Id.* Road 6232 was also constructed in the 1970s for timber access. *Id.*, Ex. I at 10. The first 0.58 mile of this road is classified as maintenance level 3, and has been open to allow public access to a picnic area. *Id.* From mile 0.58 to 2.65, this road is classified as level 1, and has been closed to vehicular traffic. *Id.*

In August, 2005, FSEEE learned that the Forest Service had already commenced and completed the road reconstruction for Road 6232 even though it had not signed a decision notice for the Overlook logging project. Stahl Dec, ¶ 3. The reconstruction of Road 6232 included the section from mile point 0.58 to 2.65, which had been closed and impassable prior to the reconstruction. *See* Stahl Dec., Ex. I at 10; Declaration of Glen Ith, ¶ 10. The reconstruction work also included the cutting of many large Sitka-spruce trees, some of which were used for bridge construction. *See* Declaration of Glen Ith, ¶ 11, Ex. C, D; Stahl Dec., Ex. J. The Forest Service has confirmed that the reconstruction of Roads 6231 and 6232 is already complete. Declaration of Marc Fink, ¶ 3.

The Forest Service informed FSEEE that the road reopening and reconstruction work for Roads 6231 and 6232 is covered by a Forest Service "categorical exclusion" for minor road repair and maintenance. Stahl Dec., Ex. J. The Forest Service, however, did not provide any public notice or scoping to disclose that it was relying on this categorical exclusion, and did not

request any public comment on this issue prior to commencing with the road reconstruction.

On November 15, 2005, the Forest Service signed the Decision Notice for the Overlook project, selecting a modified version of Alternative 4 from the Overlook EA. *See* http://www.fs.fed.us/r10/tongass/projects/decisions/overlook/05overlookdn.shtml.  According to the Decision Notice, the project would log approximately 4.1 million board feet of timber from approximately 190 acres. *Id.*  The Decision Notice did not include the reconstruction of 2.2 miles of Forest Service Road 6232 within its description of the chosen alternative, even though the Overlook EA states that such reconstruction is necessary to access proposed harvest units. The Decision Notice in fact contradicts the EA by asserting that no road reconstruction would be needed for any of the alternatives that were assessed in the Overlook EA.

On January 27, 2006, Plaintiffs FSEEE and Glen Ith administratively appealed the Overlook Decision Notice to the Regional Forester, pursuant to the Appeals Reform Act.  The Forest Service subsequently determined that "the road maintenance and repair work element of the project could be described more clearly to the public," and withdrew the Decision Notice and Finding of No Significant Impact on March 13, 2006.  Stahl Dec., Ex. K at 2.  The Forest Service, however, plans to "update the documents associated with this project in the next few months," and "release a new decision by mid-summer 2006." *Id.*  On March 15, 2006, the Forest Service informed FSEEE and Mr. Ith that it had withdrawn the Overlook decision, and that their appeal was dismissed without review. *Id.*, Ex. K at 1.

## IV.   Logging Roads Associated with the Logjam Timber Sale

On May 13, 2005, the Forest Service published its notice of intent to prepare an EIS for the Logjam Timber Sale on the Thorne Bay Ranger District of the Tongass National Forest.  70 Fed. Reg. 25525 (May 13, 2005).  The Forest Service proposes to harvest up to 50 million board feet of timber on north Prince of Wales Island, in a location south of Coffman Cove, west of

Luck Lake and East of the Naukati/Sarkar.  *Id*.  The project "would require up to 32 miles of new road construction . . . and seven miles of road reconstruction."  *Id*.  According to the latest schedule, the Forest Service expects to complete the Draft EIS for the Logjam timber sale in December, 2006, which a final decision expected in June, 2007.  *See* April, 2006 Schedule of Proposed Action, p. 22 (available at http://www.fs.fed.us/sopa/forest-level.php?111005).

On April 20, 2006, the Forest Service issued a bid solicitation for the Logjam road construction and reconstruction contract.  Second Declaration of Andy Stahl, Exhibit G. According to the bid solicitation, offers are due by May 22, 2006.  *Id*.  The Logjam road construction and reconstruction contract includes 3.79 miles of road "reconditioning" of Forest Service road, and 1.96 miles of new road construction.  *Id*. at 2.  The new construction includes "clearing and grubbing; furnishing, hauling and placing road material on the traveled way including turnouts/pullouts, parking areas and approach road intersections; installing bridges, metal culverts and log culverts; mobilization, pit development, and seeding and fertilizing."  *Id*. The government's estimate for the contract is between $250,000 and $500,000.  *Id*.

The location of the Logjam road project is on Prince of Wales Island, beginning approximately 25 miles west of the city of Thorne Bay.  Second Declaration of Andy Stahl, Exhibit G at 2.  Maps of the proposed road project and the proposed harvest units for the Logjam timber sale show that the Logjam road project would be used to help access the units for the proposed timber sale.  *See* Second Declaration of Andy Stahl, Exhibits E and F.

## STANDARD OF REVIEW

"To be entitled to preliminary injunctive relief, [FSEEE] must demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of the hardships tips in its favor."  *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 565 (9th Cir. 2000).  "These two formulations represent

two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998).

The traditional tests for injunctive relief have been modified in environmental cases. Environmental suits involve the public interest, and therefore, where the balance of hardships tips decidedly toward the plaintiff, the district court may grant preliminary injunctive relief if the plaintiff's moving papers raise serious questions on the merits. *Caribbean Marine Services v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). Environmental injury, by its nature, can also seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). "If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.*

FSEEE asserts claims under NEPA and the Appeals Reform Act. The Administrative Procedure Act ("APA") provides the standard of judicial review for the merits of FSEEE's claims. Pursuant to the APA, the challenge decisions should be "set aside" if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id.*, § 706(2)(D). In making its decision, the Forest Service "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* The APA standard "does not shield the agency action from a 'thorough, probing, in-depth review.'" *Northern Spotted Owl v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988) (citation omitted).

**ARGUMENT**

I.    **FSEEE Has Raised Serious Questions, and Will Prevail on the Merits**

   A.    **The Forest Service Violated NEPA by Relying on a "Categorical Exclusion" for the Challenged Road Construction and Reconstruction Projects, Without Providing Public Notice, Scoping, or An Opportunity for Public Comment**

"NEPA imposes a procedural requirement that an agency must contemplate the environmental impacts of its actions." *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998); *see* 42 U.S.C. § 4332. "NEPA 'ensures that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience.'" *Id., quoting Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

NEPA establishes three "categories" of agency action. *See generally, Edmonds Institute v. Babbitt*, 42 F. Supp. 2d 1, 18 (D.D.C. 1999). First, proposals that normally require an EIS should immediately trigger preparation of an EIS. 40 C.F.R. § 1501.4(a). Second, the agency may designate types of actions that normally do not require the preparation of an EIS and can therefore be "categorically excluded." 40 C.F.R. § 1508.4. If a proposed action fits within a categorical exclusion, NEPA review is not necessary unless there are "extraordinary circumstances" related to the proposed action. *Id*. Third, any action that does not fall into the first or second category should be evaluated in an EA, which must analyze whether impacts from the proposed action may be significant, and therefore require an EIS. 40 C.F.R. § 1501.4(b).

The Forest Service asserts that the SW Neets, Rockfish, Francis Cove, Road 6232 and Road 6231 projects fit within a Forest Service "categorical exclusion" concerning the repair and maintenance of roads. *See* Stahl Dec., Ex. H, J; FSH 1909.15, Chapter 31.12. FSEEE expects

that the Forest Service will similarly argue that the Logjam road construction and reconstruction project, for which the agency is currently soliciting bids, also fits within the same categorical exclusion.  The Forest Service's reliance on this categorical exclusion for these road construction and reconstruction projects is both procedurally and substantively flawed.

Procedurally, the Forest Service failed to provide public notice or scoping for any of the road construction and reconstruction projects.  *See* Stahl Dec., Ex. H, J.  A categorical exclusion is only allowed where there will not be significant environmental impacts, and where there are no "extraordinary circumstances," 40 C.F.R. § 1508.4, and therefore the Forest Service must disclose its proposal to categorically exclude an action from NEPA in order to allow the public an opportunity to identify why the exclusion may not be appropriate.  As the Forest Service states in its Handbook, "*[s]coping is required on all proposed actions, including those that would appear to be categorically excluded*."  FSH 1909.15, Chapter 30.3(3) (emphasis added).[2]  More specifically, for the category relied on by the Forest Service for these logging roads, the Forest Service acknowledges that the category may be appropriate "*unless scoping indicates extraordinary circumstances*."  FSH 1909.15, Chapter 31.12 (emphasis added).

While the Forest Service may argue that its Handbook it not legally "binding," the Handbook provides the agency's own interpretation concerning its NEPA obligation to allow public scoping and comment for actions that it proposes to exclude from NEPA review.  Furthermore, the Ninth Circuit has cited the agency's Handbook to reaffirm that the Forest Service must conduct scoping for all proposed actions, "including those that would appear to be categorically excluded."  *Alaska Center for the Environment v. U.S. Forest Service*, 189 F.3d 851, 858 (9th Cir. 1999), *quoting* FSH 1909.15, Chapter 30.2(3).  As further explained by the

_____

[2] The Forest Service Handbook is available online at:  http://www.fs.fed.us/im/directives/

Ninth Circuit, "[i]f extraordinary circumstances having a significant effect on the environment *are revealed during scoping*, then the Forest Service conducts an EA." *Id.* (emphasis added). The Forest Service's failure to conduct public scoping and allow public comment for the five road reconstruction projects at issue in this case violates NEPA.

The Forest Service similarly violated NEPA by failing to prepare findings and document its decision not to prepare an EA or EIS for any of the road projects. *See* Stahl Dec., Ex. H, J. The Court therefore cannot determine whether the application of a categorical exclusion was appropriate because "there is no contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a categorical exclusion to the facts of a particular decision." *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002). "Post hoc invocation of a categorical exclusion does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made." *Id.; see also Alaska Center for the Environment*, 189 F.3d at 859 ("When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision."); *Jones v. Gordon*, 792 F.2d 821, 828-829 (9th Cir. 1986) (the agency must address the relevant exceptions to the categorical exclusion and explain why they do not apply); *Edmonds Institute*, 42 F. Supp. 2d at 18 ("[A] post hoc assertion of a CE during litigation, unsupported by any evidence in the administrative record or elsewhere that such a determination was made at the appropriate time, cannot justify a failure to prepare either an EA or an EIS.").

Substantively, the Forest Service's use of the categorical exclusion for the logging road projects is also improper. First, as explained below, the SW Neets, Rockfish, and Francis Cove road reconstruction projects are related and connected to the proposed Traitors Cove logging project, and will contribute to cumulatively significant environmental impacts, and therefore must be assessed within a single EIS. *See* Section I, B., *infra*; 40 C.F.R. § 1508.25. Similarly,

the Logjam road construction and reconstruction project is related and connected to the proposed

Logjam timber sale, and would contribute to cumulatively significant impacts, and therefore must

be assessed within the Logjam EIS.  *See* Section I, C., *infra*; 40 C.F.R. § 1508.25.

The road construction and reconstruction projects also do not fit within the limited

categorical exclusion that is set forth in the Forest Service Handbook for the minor repair and

maintenance of roads.  The Forest Service is relying on the following categorical exclusion:

> Repair and maintenance of roads, trails, and landline boundaries.  Examples included but
> are not limited to:
> a.     Authorizing a user to grade, resurface, and clean the culverts of an established
>        National Forest System road.
> b.     Grading a road and clearing the roadside of brush without the use of herbicides.
> c.     Resurfacing a road to its original condition.
> d.     Pruning vegetation and cleaning culverts along a trail and grooming the surface of
>        the trail.
> e.     Surveying, painting, and posting landline boundaries.

FSH 1909.15, Chapter 31.1b(4).   The Logjam road project, however, includes 1.96 miles of new

road construction, which clearly is not covered by this road "maintenance" categorical exclusion.

*See* Second Declaration of Andy Stahl, Ex. G at 2.

For the other road projects, at least some of the roads being reconstructed are "level 1"

roads, meaning they have been closed for over a year, with some closed for decades.  *See e.g.*,

Stahl Dec., Ex. I at 9-10.  At issue is not simple "maintenance," such as grading, cleaning

culverts, and clearing brush.  The Forest Service is instead reopening formerly closed roads in

remote forested areas, which will have environmental impacts on a number of resources, and

conducting major reconstruction that includes the logging of numerous old-growth trees and

converting virtual grass trails back to usable logging roads.  *See* Declaration of Glen Ith, ¶¶ 9-11

(the Forest Service allowed the cutting of 300 to 800 year old trees as part of the road

reconstruction work); *id.*, Exhibits A and B (photographs showing the before and after of one of

the reconstructed roads); Declaration of David Montgomery, ¶¶ 2-7; Stahl Dec., Ex. J

("Approximately 40-45 trees were also cut (for new stringer bridges) along road 6235.").

Because the major reconstruction of these logging roads is not covered by a categorical

exclusion, the Forest Service violated NEPA by failing to prepare an EA or EIS prior to

authorizing the reconstruction projects.[3]

> **B.      The Forest Service Violated NEPA by Not Analyzing and Disclosing the
> Environmental Impacts of the SW Neets, Rockfish, and Francis Cove Road
> Reconstruction, and the Traitors Cove Logging Project, within a Single EIS**

In determining the proper scope of an EIS, an agency must consider connected,

cumulative, and similar actions.  40 C.F.R. § 1508.25.  Connected actions are actions that are

closely related and therefore should be discussed in the same EIS.  40 C.F.R. § 1508.25(a)(1).

Cumulative actions are actions which, when viewed with other proposed actions, have

cumulatively significant impacts and should therefore be discussed in the same impact statement.

40 C.F.R. § 1508.25(a)(2).  Similar actions are actions which, when viewed with other

reasonably foreseeable or proposed actions, have similarities that provide a basis for evaluating

their environmental consequences together, such as common timing and geography.  40 C.F.R. §

1508.25(a)(3).  The Rockfish, Francis Cove, and SW Neets Road Reconstruction projects, and

the Traitors Cove logging project, are connected, cumulative, and similar actions, and the Forest

Service's failure to assess the projects in a single EIS violates NEPA.

---

[3] Last, even if the Forest Service had used the proper procedures, and even if the major
reconstruction of these logging roads does fit within the limited category as now claimed by the
agency, there are likely extraordinary circumstances that would still prohibit the use of the
exclusion for these road reconstruction projects.  *See* FSH 1909.15, Chapter 30.3(2) (wetlands,
inventoried roadless areas, Alaska Native religious or cultural sites, archaeological sites.).

        **1)**        **The Road Reconstruction and Logging Project are Connected Actions**

"The CEQ regulations require 'connected actions' 'to be considered together in a single EIS." *Save the Yaak Committee v. Block*, 840 F.2d 714, 719 (9th Cir. 1988), *quoting Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985). Connected actions (I) automatically trigger other actions which may require an EIS, (ii) cannot or will not proceed unless other actions are taken previously or simultaneously, or (iii) are independent parts of a larger action and depend on the larger actions for their justification. *Id*.; 40 C.F.R. § 1508.25(a)(1).

In *Save the Yaak Committee v. Block*, the Forest Service was reconstructing sections of the Yaak River Road on the Kootenai National Forest. 840 F.2d at 716. Plaintiffs argued that the Forest Service was proposing timber sales that were related to various sections of the reconstructed road, and that the sales and road were required to be analyzed together in an EIS. *Id*. at 717. The Ninth Circuit looked to a number of factors and concluded that "there is a close nexus between the timber contracts and the improvement of the road." *Id*. at 720. The evidence established that the purpose of the road reconstruction "was to make the log hauling more efficient, productive, and safe," and there was "no indication that the road was reconstructed for any other reason." *Id*. Because the road reconstruction and timber harvest were "connected actions," they were required to be analyzed together in a single NEPA document. *Id*.

Similarly, in *Thomas v. Peterson*, plaintiffs sought to enjoin construction of a logging road, arguing that the Forest Service was required to analyze the combined environmental impacts of the road and the associated timber sales. 753 F.2d at 755. At issue was the Forest Service's approval of a logging road in the Jersey Jack area of the Nez Perce National Forest. *Id*. at 756. The Forest Service had prepared an EA for the logging road, but was preparing separate EAs for the timber sales that the road was designed to facilitate. *Id*. at 757. The Ninth Circuit determined that the timber sale could not proceed without the logging road, and that the road

would not have been built but for the contemplated timber sales.  *Id*. at 758.  Because the road

construction and contemplated timber sales were "inextricably intertwined," they were found to

be connected actions that were required to be assessed in a single NEPA document.  *Id*. at 759.

The facts in this case demonstrate that the Forest Service is once again improperly

segmenting road work from associated timber sales.   The Traitors Cove logging project was

initially segmented into the SW Neets, Rockfish, and Francis Cove timber sales, and the National

Marine Fisheries Service expressed concern that the "proposed timber sales would require

marine access facilities (MAFs) at Fire Cove, SW Neets, and Margaret Bay."  Stahl Dec., Ex. E.

The Forest Service later confirmed that the logs harvested in the combined Traitors Cove project

"would be barged from three existing marine access facilities located at Margaret Bay, SW

Neets, and Fire Cove."  70 Fed. Reg. at 16,795-96.[4]  The roads that are now currently being

reconstructed (SW Neets, Rockfish, and Francis Cove) in fact lead to the marine access facilities

that would be used to haul the timber from the Traitors Cove project.  *See* Stahl Dec., Ex. L at 2;

Ex. M at 2.  Moreover, the maps of the proposed harvest units for the SW Neets, Rockfish, and

Francis Cove timber sales (which are now combined into the Traitors Cove project) further

demonstrate that the SW Neets, Rockfish, and Francis Cove logging roads are being constructed

to facilitate the proposed logging, as the proposed harvest units are adjacent to the portions of the

roads that are being reconstructed.  *See* Stahl Dec., Ex. D at 3-5.

The Fire Cove, SW Neets, and Margaret Bay marine access facilities are needed to

transport the timber that is harvested from the Traitors Cove project, and the road reconstruction

of the three roads is necessary to access these marine access facilities.  Therefore, as in *Thomas v.*

---

[4] *See also* Stahl Dec., Ex. G ("Some segments of all three of these systems could be used
in the Traitor's Cove project to haul timber to the respective Log Transfer Facility (LTF) to load
on a barge that would be towed to a location for log processing.").

*Peterson*, it is clear that the logging project could not proceed without the reconstruction of the logging roads, and the projects are "inextricably intertwined." 753 F.2d at 758-59.  Similarly, as in *Save the Yaak v. Block*, the purpose of the SW Neets, Rockfish, and Francis Cove road reconstruction projects is "to make the log hauling more efficient, productive, and safe," and there is again no indication that the roads are being reconstructed for any other reason.  840 F.2d at 720.[5]  The Forest Service recognized the need to prepare a single EIS to assess the cumulative impacts of the three proposed timber sales, 70 Fed. Reg. 16,795 (April 1, 2005), but improperly segmented out the road reconstruction work that is necessary for the overall logging proposal.  Because the road reconstruction and proposed timber harvest are connected actions, they must be analyzed in a single EIS.  40 C.F.R. § 1508.25(a)(1).

### 2) The Road Reconstruction and Logging Project May Result in Cumulatively Significant Impacts

"The CEQ regulations also require that 'cumulative actions' be considered together in a single EIS."  *Thomas v. Peterson*, 753 F.2d at 759, *citing* 40 C.F.R. § 1508.25(a)(2).  "Both connected actions and unrelated, but reasonably foreseeable, future actions may result in cumulative impacts."  *Save the Yaak v. Block*, 840 F.2d at 721.  As stated, the Forest Service initially proposed three separate environmental assessments for the SW Neets, Rockfish, and Francis Cove timber sales.  *See* Stahl Dec., Ex. D.  The Forest Service, however, acknowledged "that there was a possibility of significant cumulative effects on these project areas" when it combined the three projects into one EIS.  70 Fed. Reg. 16,795 (April 1, 2005).

---

[5] *See* http://www.fs.fed.us/r10/tongass/forest_facts/faqs/roadmtce.shtml ("In the last three years, the Forest Service has received $5 million *for improving access for timber sales*.  The funds are used to award public works contracts for road reconstruction, and occasionally new construction, and to offset the cost of building roads to higher standards.") (emphasis added).

The SW Neets, Rockfish, and Francis Cove road reconstruction projects will add to the cumulative impacts of the logging proposal. As explained by Dr. David Montgomery, "[t]he amount of sediment delivered to streams from roads can exceed the combined amount resulting from all other land management activities in forested mountain drainage basins." Declaration of David Montgomery, ¶ 2. The heavy equipment necessary for road reconstruction disturbs and compacts soils, and removes protective vegetative cover. *Id.*, ¶ 4. And the subsequent use of the newly reconstructed roads will result in a significant source of erosion, with sediment transported in streams. *Id.*, ¶¶ 5-6. Most importantly, the amount of erosion created by road reconstruction, when added together with other sediment sources, such as timber sales, "can substantially degrade water quality and fish habitat." *Id.*, ¶ 7.

As explained by Forest Service wildlife biologist Glen Ith, the reconstruction of logging roads can also have adverse impacts on wildlife species, especially if the road had previously been closed to motorized use. Declaration of Glen Ith, ¶ 9. Road reconstruction can "increase the accessibility to high value old-growth marten habitat for trappers and greatly increases the vulnerability and mortality rates for these old-growth associated species." *Id.* The alder and young conifer trees that had been maturing in these closed roads were also important for wildlife, as these stands produce "high biomass understories" that provide important wildlife habitat. *Id.*

As in *Thomas v. Peterson*, 753 F.2d at 759, the road work and timber harvest may result in cumulatively significant impacts, and therefore the Forest Service is required to prepare one comprehensive EIS to analyze the overall, combined impact. 40 C.F.R. § 1508.25(a)(2). And, as explained below, the Forest Service is prohibited from taking any action on these roads that would have an adverse or irretrievable impact prior to the completion of the comprehensive EIS.

**C.    The Forest Service Violated NEPA by Not Analyzing and Disclosing the Environmental Impacts of the Logjam Road Construction and Reconstruction Project, and Logjam Timber Sale, within a Single EIS**

For many of the same reasons set forth in Section I.B., *supra*, the Forest Service must analyze the overall, cumulative impacts of the Logjam road project and the proposed Logjam timber sale in a single EIS.  The projects are again connected, as the Logjam roads are being constructed and reconstructed to access the harvest units of the proposed Logjam timber sale. *See* Second Declaration of Andy Stahl, Exhibits E and F.  And the road work and timber sales will likely result in cumulative impacts, as recognized by the Forest Service in its federal register notice for the Logjam timber sale.  70 Fed. Reg. at 25527 ("Cumulative effects of the proposed harvest and road construction may increase sedimentation, which could alter stream channel morphology and degrade fish habitat in the project area.").  Because the actions are connected and cumulative, they must be assessed in the same EIS.  40 C.F.R. § 1508.25(a)(1-2).

**D.    The Forest Service Violated NEPA by Proceeding with the Reopening and Reconstruction of the Logging Roads Prior to Completing the Environmental Analyses for the Associated Timber Sales**

The reconstruction of the SW Neets, Rockfish, and Francis Cove roads are part of the larger Traitors Cove logging project, for which the Forest Service is in the process of preparing an EIS.  In fact, the Traitors Cove EIS combines three formally proposed timber sales that were named after these roads: the SW Neets timber sale, the Rockfish timber sale, and the Francis Cove timber sale.  *See* 70 Fed. Reg. 16,795 (April 1, 2005).  Even though the Forest Service is still in the process of preparing the Traitors Cove EIS, it has already entered into contracts for the SW Neets, Rockfish, and Francis Cove road reconstruction work.  In addition, much of this road reconstruction is already completed, as SW Neets is finished, Rockfish is 79 percent complete, and Francis Cove is scheduled to start as soon as weather permits.  Declaration of Marc Fink, ¶ 3.

Similarly, the Forest Service proposed to reconstruct Roads 6231 and 6232 as part of the

Overlook logging project.  As stated in the cover page to the Overlook EA, "[a]pproximately 2.2 miles of existing classified roads that are currently closed to motorized traffic would be reconstructed to provide access to some of the proposed timber harvest units."  Stahl Dec., Ex. I at 2.  Each of the "action" alternatives assessed in the Overlook EA included the reconstruction of either Road 6231 or 6232.  *Id.,* Ex. I at 6-8.  Only the mandatory "no action" alternative included no road reconstruction, as it proposed no timber harvest.  While the Overlook decision notice has been withdrawn, the Forest Service still intends to proceed with the Overlook project.  *See* Stahl Dec., Ex. K at 2 ("I expect to release a new decision by mid-summer 2006.").

The Ninth Circuit has emphasized that "[p]roper timing is one of NEPA's central themes."  *Save the Yaak*, 840 F.2d at 718.  The very purpose of NEPA is for federal agencies to analyze and disclose the environmental consequences of their proposals "before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).  By entering into contracts and allowing reconstruction to commence for the SW Neets, Rockfish, and Francis Cove roads, along with Roads 6231 and 6232, prior to completing the NEPA process and signing the decision documents, the Forest Service violated numerous NEPA requirements.

First, the NEPA regulations, which are binding on all federal agencies, set forth the "[l]imitations on actions during the NEPA process."  40 C.F.R. § 1506.1.  Agencies are prohibited from taking any action concerning a proposal that would have an "adverse environmental impact."  40 C.F.R. § 1506.1(a)(1).  The reconstruction of these roads, which included the cutting of numerous old growth trees and the reopening of formally closed roads in remote, forested areas, has had and will continue to have adverse impacts on the environment, in violation of NEPA.  *See* Stahl Dec., Ex. J; Declaration of Glen Ith, ¶¶ 9-11; Declaration of David Montgomery, ¶¶ 4-7.

Second, agencies are prohibited from taking any action concerning a proposal that would "[l]imit the choice of reasonable alternatives."  40 C.F.R. § 1506.1(a)(2).   By entering into contracts for road reconstruction and allowing much of the reconstruction to proceed during the NEPA process, the Forest Service unduly limited and prejudiced its choice of reasonable alternatives for the Traitors Cove and Overlook logging projects, in violation of NEPA.  40 C.F.R. § 1506.1(a)(2); 40 C.F.R. § 1502.2(f).  The Forest Service also improperly foreclosed consideration of the mandatory "no action" alternative.  40 C.F.R. § 1502.14(d).

Third, NEPA prohibits the Forest Service from making any irreversible commitment of resources pending the completion of its NEPA analysis.  *Metcalf v. Daley,* 214 F.3d 1135, 1143 (9th Cir. 2000); *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir. 1988); 42 U.S.C. § 4332(C)(v).  The road reconstruction work for these logging roads includes the cutting of trees, some of which are old-growth trees.  *See* Stahl Dec., Ex. J ("Approximately 40-45 trees were also cut"); Declaration of Glen Ith, ¶ 11 ("The Forest Service allowed the harvest of many large old-growth Sitka spruce (estimated ages of between 300 to 800 years old), averaging over 40 inches in diameter at breast height (DBH) as part of the road reconstruction work.").  The courts have recognized that the cutting of trees, and especially the cutting of old-growth trees, is irreversible. *See Neighbors of Cuddy Mountain v. U.S. Forest Service,* 137 F.3d 1372, 1382 (9th Cir. 1998); *Portland Audubon Society v. Lujan*, 795 F. Supp. 1489, 1509 (D. Or. 1992).  Because this irreversible cutting of trees occurred prior to the completion of the NEPA process for the Overlook and Traitors Cove logging projects, the Forest Service violated NEPA.

In *Save the Yaak*, the Forest Service was reconstructing the Porcupine Sullivan Creek section of the Yaak River road prior to preparing an EA.  840 F.2d at 716.  When the EA was eventually prepared, it "[h]ad nothing to do with the question of environmental impact of the road itself, because it [already] existed."  *Id*. at 718.  The Ninth Circuit found the preparation of

the EA to be untimely, noting that "inflexibility may occur if delay in preparing [the EA] is allowed." *Id*. at 718.  As further explained, "[a]fter major investment of both time and money, it is likely that more environmental harm will be tolerated."  *Id*., *quoting Confederated Tribes and Bands of the Yakima Indian Nation v. FERC*, 746 F.2d 466, 471-72 (9ᵗʰ Cir. 1984).[6]  The Ninth Circuit concluded:

> In this case, the reconstruction contracts were awarded prior to preparation of the EAs, . . .. These events demonstrate that the agency did not comply with NEPA's requirements concerning the timing of their environmental analysis, thereby seriously impeding the degree to which their planning and decisions could reflect environmental values.

*Id*. at 718-19.  For the logging roads in this case, the Forest Service does not even propose to prepare an environmental analysis for the reconstruction projects, and improperly allowed work to commence prior to the completion of the NEPA process for the associated timber sales.

The Ninth Circuit has also held that an agency cannot enter into agreements that would bind them to a particular course of action prior to preparing an EA.  *Metcalf v. Daley* 214 F.3d 1135 (9ᵗʰ Cir. 2000).  In *Metcalf*, the Makah Indian Tribe entered into agreements with the National Marine Fisheries Service concerning its plan to resume whaling.  The Ninth Circuit found that the agency did not consider the potential environmental effects of proposed action "until long after they had already committed in writing to support the Makah whaling proposal." *Id*. at 1143.  Because the agency made the decision to support the Tribe's proposal before the EA process began, "the die already been cast" by the time the EA was prepared.  *Id*. at 1144.  The Ninth Circuit held that the agency violated NEPA "by making such a firm commitment before

---

[6] *See also Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979) (agencies must "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values."); *Metcalf v. Daley*, 214 F.3d at 1142 ("An assessment must be 'prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.'"); 40 C.F.R. § 1502.5.

preparing the EA." *Id*. at 1145.  The Forest Service in this case similarly violated NEPA by entering into contracts for the SW Neets, Rockfish, Francis Cove, Road 6231 and Road 6232 reconstruction projects, and thereby binding itself to reconstructing the roads before completion of the Traitors Cove EIS and Overlook EA.  *See e.g*., Stahl Dec., Ex. N, O, P.[7]

> **E.      The Forest Service Violated the Appeals Reform Act by Authorizing and Proceeding with the Road Projects Prior to Providing Public Notice, Accepting Public Comments, and Allowing Administrative Appeals**

The Appeals Reform Act ("ARA") grants individuals the right to be notified, submit comments, and file administrative appeals of Forest Service decisions. 16 U.S.C. § 1612 Note. The ARA's notice, comment and administrative appeal requirements apply to all Forest Service projects and activities that implement forest plans.  16 U.S.C. § 1612(a); *Wilderness Society v. Rey*, 180 F.Supp.2d 1141, 1148 (D. Mont. 2002).  The ARA directs the Forest Service to establish a notice and comment process "for proposed actions of the Forest Service concerning projects and activities implementing [forest plans]," and to modify the administrative appeal procedures for the decisions concerning these same projects.  16 U.S.C. § 1612(a)

The SW Neets, Rockfish, Francis Cove, Road 6231, Road 6232, and Logjam road projects, together with the Traitors Cove, Overlook, and Logjam timber sales, were designed to implement the goals and objectives of the Tongass Forest Plan.  *See* 70 Fed. Reg. at 16795 (Traitors Cove project) ("The purpose and need for the proposed [Traitors Cove] action responds to the goals objectives identified in the Tongass Land Management Plan, as amended, and helps move the area toward the desired conditions as described in the forest plan."); Overlook Decision Notice, p. 2 (http://www.fs.fed.us/r10/tongass/projects/decisions/overlook/05overlookdn.shtml)

---

[7] If the Forest Service proceeds to sign the contract for the Logjam road construction and reconstruction project, as expected on or about May 22, 2006, *see* Second Declaration of Andy Stahl, Exhibit. G, this would similarly bind the agency to a particular course of action for the Logjam timber sale and result in an additional NEPA violation.

("The Overlook Project Area is included as part of the overall Tongass National Forest timber sale program."); 70 Fed. Reg. at 25526 (Logjam project) ("The purpose of and need for the Logjam Timber Sale project is to provide timber harvest opportunities . . . in accordance with Forest Plan direction.").  Whether viewed as individual road projects or components of the proposed timber sales, the public was entitled to be notified, submit comments, and administratively appeal the reopening and reconstruction of these logging roads before contracts were signed and before any road work commenced.  16 U.S.C § 1612 (b), (c), (d).  The Forest Service's failure to timely provide notice, accept public comment, and allow administrative appeals violates the ARA.  *Id.*

The Forest Service may argue that because it "categorically excluded" the road projects from NEPA, the notice, comment, and an administrative appeal procedures of the Appeals Reform Act were not required.  Congress, however, did not exempt "categorically excluded" projects from the mandatory requirements of the Appeals Reform Act, but instead required that all projects implementing forest plans be subject to notice, comment, and appeal.  16 U.S.C. § 1612(a).  While the Forest Service recently revised its regulations in an attempt to exempt numerous types of categorically excluded projects from notice, comment and appeal, 68 Fed. Reg. 33581-33602 (June 4, 2003), these new regulations have been found to be "manifestly contrary" to the ARA and invalid.  *Earth Island Institute v. Pengilly*, 376 F.Supp.2d 994, 1004-05 (E.D. Cal. 2005); *see also Wilderness Society v. Rey*, Civ. 03-119-M-DWM (D. Montana) (April 24, 2006, Order) (also finding these new regulations to be contrary to the ARA).

## II.    FSEEE Will Suffer Irreparable Harm if an Injunction is Not Issued, and the Balance of Harms Tips Strongly in FSEEE's Favor

FSEEE and the environment have been harmed by the road reconstruction that has already been completed, and will continue to be harmed if additional road work is allowed to

proceed without the benefit of a NEPA analysis. Although road reconstruction may disturb a relatively small portion of a watershed, "the resulting changes in runoff generation and sediment production may significantly affect stream channels." Declaration of David Montgomery, ¶ 2. In fact, "[t]he amount of sediment delivery to streams from roads can exceed the combined amount resulting from all other land management activities in forested mountain drainage basins." *Id*. The sources of soil erosion associated with road reconstruction include the re-building activity itself, where heavy equipment compacts the soil and removes protective vegetative cover, as well as the erosion associated with the use of the newly-opened logging roads. *Id*., ¶ 4. According to a Forest Service wildlife biologist, the road reconstruction can also "have adverse impacts on a number of wildlife species." Declaration of Glen Ith, ¶ 9.

The significance of the harm caused by the past and future road construction and reconstruction is unknown, however, because the Forest Service has failed to prepare an environmental analysis, in violation of NEPA. *See* Declaration of David Montgomery, ¶ 9. The Forest Service has also failed to consider public comment and allow administrative appeals, in violation of the Appeals Reform Act. These mandatory procedures were specifically enacted by Congress to produce better agency decisions and less environmentally-harmful agency actions. *See* 40 C.F.R. § 1500.1( c) ("NEPA's purpose is not to generate paperwork . . . but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."); *see also* Declaration of Andy Stahl, ¶ 2.

The Ninth Circuit has recognized that environmental plaintiffs are harmed where activities are improperly allowed to proceed without the benefit of the required NEPA analysis. *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 971 (9th Cir. 2003). This "procedural" harm to an environmental plaintiff is tied to a "substantive" harm to the

environment, which "consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment." *Id., citing West v. Sec'y of Dep't of Transportation*, 206 F.3d 920, 930 n. 14 (9th Cir. 2000); *see also Thomas v. Peterson*, 753 F.2d at 764 ("[i]rreparable damage is presumed to flow from a failure properly to evaluate the environmental impact of a major federal action."); *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 966 (9th Cir. 1983) ("The premise for relaxing the equitable tests in NEPA cases is that irreparable damage may be implied from the failure of responsible authorities to evaluate thoroughly the environmental impact of a proposed federal action.").  Because there are no "unusual circumstances" in this case, an injunction should be issued to prohibit further harm to FSEEE and the environment.  *See Thomas v. Peterson*, 753 F.2d at 764; *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1250 (9th Cir. 1984).

In contrast to the substantial harm to FSEEE and the environment that has already occurred, the Forest Service would suffer minimal harm by a temporary injunction in this case. These logging roads have apparently not been used for years, and are not needed until the proposed timber sales are ready to proceed, after the mandatory NEPA process has run its course. The Forest Service will have time to construct and reconstruct these roads if and when the proposed logging is approved.  FSEEE therefore respectfully requests the Court to temporarily enjoin any further reconstruction of the roads that are necessary to access the timber proposed for harvest for the Overlook and Traitors Cove timber sale pending the resolution of this case. FSEEE similarly requests that the Forest Service be enjoined from entering into any contracts or otherwise authorizing any road construction or reconstruction concerning the roads associated with the Logjam timber sale pending the resolution of this case.

## CONCLUSION

For the above stated reasons, FSEEE's amended motion for a temporary restraining order and preliminary injunction should be granted.  The Forest Service should be immediately enjoined from any further road work or reconstruction concerning the following road construction contracts: SW Neets, Rockfish, and Francis Cove, Forest Service Road 6231 and Forest Service Road 6232.  The Forest Service should also be enjoined from entering into any contracts or otherwise implementing any road construction or reconstruction associated with the Logjam timber sale on the Thorne Bay Ranger District.

DATED this 9th day of May, 2006.

Respectfully submitted,

s/ Marc D. Fink
Marc D. Fink (MN License # 343407)
4515 Robinson Street
Duluth, Minnesota 55804
Tel: 218-525-3884
Fax: 218-525-3857
marc@marcdfink.com

Peter Van Tuyn (AK Bar # 8911086)
Bessenyey & Van Tuyn
310 K Street, Suite 200
Anchorage, AK 99501
Tel:  907-278-2000
Fax:  907-278-2004
pvantuyn@earthlink.net

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on May 9th, 2006, a copy of Plaintiffs' Memorandum in Support of Amended Motion for Temporary Restraining Order and Preliminary Injunction was served electronically on:

Bruce M. Landon

s/ Marc D. Fink